**Carolyn C. GLASSCOCK, Appellant,**

v.

**INCOME PROPERTY SERVICES, INC., Vanguard Security, Inc., and Travelers Insurance Co., Appellees.**

**No. 01–92–01257–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 10, 1994.

Rehearing Overruled Dec. 8, 1994.

Marian S. Rosen, Houston, for appellant.

Robert L. Adams, Frances Moore Combs, Nancy Vassallo, Houston, for appellees.

Before COHEN, HEDGES and WILSON, JJ.

## OPINION

HEDGES, Justice.

Appellant, Carolyn C. Glasscock, sued the appellees, Travelers Insurance Co., Income Property Services, Inc. (IPS), and Vanguard Security, Inc. (collectively, the defendants), alleging that their negligence in providing adequate security was the proximate cause of the damages she incurred as a result of being abducted from a parking garage and raped. A jury found Glasscock's abduction and rape were not proximately caused by the negligence, if any, of either the defendants or Glasscock. In nine points of error, Glasscock complains about missing pleadings and exhibits, the trial court's exclusion of certain evidence, and allegedly improper jury argument. We reverse and remand.

### Factual background

In 1989, Glasscock was employed as a contract employee by BP America, Inc. In the fall of 1989, she began working for a BP subsidiary, TEX/CON Oil & Gas Co.,[1] and

1. Glasscock's original petition included BP America and TEX/CON as defendants. They settled with Glasscock before trial.

moved to TEX/CON's offices in the Williamstown Office Tower, located at 9401 Southwest Freeway in Houston. TEX/CON occupied the entire building except the lobby, which housed a small deli and a bank. Travelers owned the Williamstown Office Tower. IPS managed the property. Vanguard provided security for the lobby of the building, as well as the building perimeter and the adjacent parking garage. Burns International Security Services, Inc. provided security for the 11 upper floors occupied by TEX/CON.[2]

Vanguard's contract with IPS required that on Monday through Friday, two security officers would be on duty from 7:00 a.m. to 6:00 p.m., and one security officer would be on duty in the lobby from 6:00 p.m. until 7:00 a.m. During the day, the two security officers alternated patrolling the garage every 30 minutes, and from 5:30 until 6:00 p.m., one security officer monitored the garage entrance.

On January 8, 1990, Glasscock left her office about 6:15 p.m. The Vanguard security officer who was supposed to be at the security desk in the lobby was not at his post. Glasscock did not sign out at the security desk, as tenants were expected to do. She walked from the office building to the garage and took the garage elevator to the third level. She got into her car and locked the door. As she was putting on her seat belt, she noticed something out of the corner of her eye. She looked up to see a man standing beside her car, with a gun pointed at her head. The man told her he just wanted her car. Glasscock hesitated, then opened the driver's side door, intending to get out. The man shoved her over, forced her head into his lap, and, with the gun pointed at her, sped from the garage. The man drove to a partially developed subdivision in Missouri City, tied her hands with a plastic bag and raped her. He then dragged her from the car and told her to start walking. As Glasscock walked across an empty field, the man drove away. Glasscock sought shelter at a nearby home. Her assailant was never caught. Glasscock brought this negli-

gence action against the appellees, alleging that her injuries and damages were the result of inadequate security at Williamstown Office Tower.

## The jury charge

Jury question number one, and the jury's answer to the question, read as follows:

Did the negligence, if any, of those named below, proximately cause the occurrence in question?

"Negligence," when used with respect to an owner or occupier of a premises, means failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a condition on the premises which the owner or occupier knows about or in the exercise of ordinary care should know about.

"Negligence," when used with respect to the conduct of Carolyn Glasscock, means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person or entity of ordinary prudence under the same or similar circumstances.

"Proximate cause" means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

"New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, which destroys the causal connection, if

2. Glasscock also sued Burns. The trial court granted a summary judgment in Burns' favor prior to trial.

any, between the act or omission inquired about and the occurrence in question, and thereby becomes the immediate cause of such occurrence.

Answer "Yes" or "No" for each of the following:

| | |
|---|---|
| Income Property Services | No |
| Vanguard Security, Inc. | No |
| Travelers Insurance Co. | No |
| Carolyn Glasscock | No |

### Missing pleadings and exhibits

In her first point of error, Glasscock asserts that because several of the exhibits admitted at trial and some of the pleadings had been lost, she should be granted a new trial.

On November 16, 1993, this Court abated this appeal and ordered the parties to substitute the missing pleadings and exhibits that were the subject of this point of error, and, if necessary, to request a hearing on disputed matters relating to the substitution. On December 10, 1993, Glasscock's attorney notified this Court that the parties filed an agreed motion to substitute copies of exhibits and pleadings missing from the transcript. On December 21, 1993, a supplemental transcript was filed with this Court. It contained the parties' agreed motion to substitute, to which were attached duplicates of the missing exhibits and pleadings, and the trial court's signed order, designating that the copies be substituted for the missing pleadings and exhibits. Glasscock's first point of error is moot. We overrule point of error one.

### Excluded evidence

In points of error two through eight, Glasscock asserts the trial court committed reversible error in excluding certain evidence. Preliminary questions concerning the admissibility of evidence are determined by the trial court. TEX.R.CIV.EVID. 104(a). This determination will not be overturned absent an abuse of discretion. *Steenbergen v. Ford Motor Co.,* 814 S.W.2d 755, 760 (Tex. App.—Dallas 1991, writ denied), *cert. denied,* — U.S. ——, 113 S.Ct. 97, 121 L.Ed.2d 58 (1992). Error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected. TEX.R.CIV.EVID. 103(a). For the exclusion of evidence to constitute reversible error, Glasscock must show (1) that the trial court committed error, and (2) that the error was reasonably determined to cause and probably did cause rendition of an improper judgment. *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992); *Stern v. Wonzer,* 846 S.W.2d 939, 947 (Tex.App.—Houston [1st Dist.] 1993, no writ); TEX.R.APP.P. 81(b)(1). It is not necessary for Glasscock to prove that *but for* the exclusion of evidence, a different judgment would necessarily have resulted; she is only required to show that the exclusion of evidence *probably* resulted in the rendition of an improper judgment. *McCraw,* 828 S.W.2d at 758; *Stern,* 846 S.W.2d at 947. In making this determination, we must review the entire record. *McCraw,* 828 S.W.2d at 758.

In her fourth point of error, Glasscock asserts the trial court reversibly erred in excluding the testimony of her expert, Horace B. Loomis. Glasscock asserts Loomis, a security expert, would have testified regarding the adequacy of the defendants' safety procedures and the foreseeability of her abduction and rape.

As her bill of exception, Glasscock offered Loomis' deposition testimony. In his deposition, Loomis stated that the defendants were negligent because: they failed to communicate to Glasscock the availability of an escort service; they failed to provide a uniformed guard after 6:00 p.m. in the garage; and "it is common knowledge to people in my profession that parking garages are dangerous." He stated that Glasscock's abduction from an enclosed garage and subsequent rape could have been anticipated. Loomis expressed the opinion that the presence of a uniformed guard at the entrance of the garage after 6:00 probably would have deterred this crime, and stated:

> The presence of a security guard, a [sic] protective lighting.... The fencing, of course, would help them control access in the garage by fencing off the apartment, fencing off the ability to get into the garage without coming through the drive-through entry and exit, by climbing over the fence—if they fence the first floor

ramps and also the third floor ramps around the cooler. All those things, a hardening of security are significant, but I think the most significant would have been the posting of a guard.

 The rules of evidence provide: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise." TEX.R.CIV.EVID. 702. Thus, the threshold issue in determining the admissibility of an expert's testimony is whether such testimony will be helpful to the trier of fact.

 Expert testimony should be admitted only when it will aid the jury in making inferences regarding fact issues more effectively. *Story Serv., Inc. v. Ramirez*, 863 S.W.2d 491, 499 (Tex.App.—El Paso 1993, writ denied). When the jury is equally competent to form an opinion regarding ultimate fact issues, the expert's testimony as to these issues may be excluded. *Id.* However, "a court need not exclude expert testimony when the subject matter is within the comprehension of the average juror if the witness has some specialized knowledge to offer on the same issue which would be helpful." John F. Sutton, Jr. & Cathleen C. Herasimchuk, *Article VII: Opinions and Expert Testimony*, 30 HOUS.L.REV. 797, 817 (1993) (Texas Rules of Evidence Handbook). "The question under Rule 702 is not whether the jurors know *something* about this area of expertise but whether the expert can expand their understanding of this area in any way that is relevant to the disputed issues in the trial." *Id.* at 829 n. 112.

Here, the trial court excluded both Glasscock's and defendants' expert witnesses on the basis that the jury was as capable as an expert of drawing a conclusion about the facts in this case. At the pretrial hearing, the trial court stated:

Any expertise other than just drawing a conclusion based on the facts which the jury is equally capable of doing that these security experts will give to us [sic].... I don't normally allow security experts in

security cases to question what a reasonable property owner would have foreseen and that unless the security experts are going to testify about something that property owners know and how they would think, which since they are usually police officers, they can't do, that the jury would not also know and be entitled to draw their own conclusions about, I don't use them.

. . . .

In other words, there's no such thing as an expert who goes and gets a college degree on how much security should be at the building. This is a judgment call, by normal people. Now, if there is something about, you know, what other businesses do, that both sides put it [sic], that has relevance. It is not proof of the standard of care, though.

Mr. Allen [attorney for IPS]: Right, their expertise will be as to what the normal amount of security is at buildings of this sort.

The Court: See that's—that is, I mean, that's trying to say standard of care. Saying what an ordinary prudent property— uh-uh, those people are ordinary prudent people. They can decide what an ordinary prudent property owner is going to do.

 We disagree that the security provisions for a commercial office building like the Williamstown Office Tower is a subject within the comprehension of the average juror. Additionally, to the extent that the average juror knows something about this subject, we believe the expertise of a witness with specialized knowledge would assist the trier of fact. Finally, a college degree is not required by rule 702 and what other businesses do is evidence of the standard of care, although it is not conclusive. *See The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932).

The supreme court case of *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456 (Tex.1992), illustrates how expert testimony can assist a fact finder on the subject of adequate security for a commercial enterprise. Diana Havner, an overnight clerk at an E–Z Mart convenience store, was abducted from the store, raped, and murdered by an unknown assailant. *Id.* at 457. Her family brought a

negligence action against E–Z Mart. A jury found that E–Z Mart's failure to provide a safe place to work was a cause of Havner's abduction, rape, and murder. *Id.* The court of appeals reversed, holding there was no evidence that the store's negligently deficient security system was a cause of Havner's death. The supreme court disagreed with the court of appeals, and reversed for a review of the factual sufficiency of the evidence to support the jury's finding as to causation. *Id.*

In considering the "no evidence" point of error, the supreme court detailed the testimony of the plaintiffs' four security, alarm, and law enforcement witnesses. *Havner*, 825 S.W.2d at 459–60. The court concluded that on the basis of this and other evidence, some evidence existed to support the jury's finding. *Id.* at 461. Labelling the experts' testimony "key evidence," the court stated, "Given their knowledge of the underlying facts and their expertise, the witnesses' testimony met the requirements of assisting the factfinder and should not be disregarded as insisted by the dissent." *Id.* at 460 n. 4. *Havner* does not address the exclusion of expert testimony. However, we find the supreme court's language concerning the value of the experts' testimony in that case instructive.

We further note that the appellees argued strenuously in closing that Glasscock's abduction was a crime that could not have been deterred:

> This case is not about escorts, it is not about sign-in, sign-out sheets. It is not about the guard patrol in that garage. This case is about a sick and mad rapist who came to that building with a gun and put it to this lady's head and abducted her. If you really believe that one guard patrolling that garage who may or may not have been on that floor at the time this deranged, sick rapist abducted this woman could've prevented this, then I would respectfully say that we must disagree. Because when you have a man that is willing to use a gun in a crime, when you have a man that is willing to run from the police,

jump over a fence, when you have a man who's willing to rape a woman, commit an act that heinous' and violent, I submit to you that having another guard in that garage is not going to prevent this crime from happening.

Loomis' deposition testimony reflected that, in his opinion, the presence of a uniformed guard at the entrance of the garage would have deterred unauthorized persons from entering the garage and might have deterred this crime. We fail to see how Loomis' testimony would not have aided the jury in understanding this disputed issue.

The record contains another compelling reason why expert testimony would have aided the jury. TEX/CON, Glasscock's employer and the primary tenant of the Williamstown Office Tower, commissioned Burns Security to prepare a security survey to "assess the physical security of the perimeter and garage facility of" the office building.[3] If the tenants of the Williamstown Office Tower requested the advice of experts to determine the adequacy of the security at their place of business, it would be counterintuitive to conclude that expert testimony on that subject would not assist the trier of fact.

 We find that the trial court abused its discretion in excluding the testimony of Glasscock's expert witness. We further find that the exclusion of this evidence probably resulted in the rendition of an improper judgment.

We reverse the judgment of the trial court and remand. In light of our disposition of this point of error, we need not address Glasscock's remaining points of error.

WILSON, J., concurs.

WILSON, Justice, concurring.

I agree with the majority's holding that the exclusion of the appellant's expert, Mr. Loomis, was error even though a countervailing expert of the appellees was also excluded. I further agree that the exclusion of the expert probably did cause a rendition of an

---

3. This survey, conducted in late 1989 and presented to TEX/CON on January 11, 1990, three days after the rape, was offered into evidence by Glasscock, but was excluded by the trial judge.

improper judgment when considered alone or when considered in conjunction with certain other evidentiary rulings made by the trial court and assigned as error.

After considering the entire record as we are obligated to do under *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992), I note the trial court's expressed motivation in excluding some otherwise relevant evidence was to shorten the trial's duration. However difficult the press of large dockets may become, shortening a trial cannot become an end in itself. Jury trials under our prevailing system are not summary trials. To me, the reality of this proceeding was that the trial court's numerous exclusionary evidentiary rulings effectively stripped the flesh and blood from the plaintiff's case and left only a prima facie skeleton to present to the jury. For this and for other reasons, I join the majority.